IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ELIZABETH HAMMOCK, et al., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BOROUGH OF UPPER DARBY, et al., | : | NO. 06-CV-1006 |
| Defendants. | : | |

MEMORANDUM AND ORDER

AND NOW, this  31st  day of October 2007, it is hereby ORDERED that Defendant

Officer Wayne Whitlock's Motion for Summary Judgment (Doc. No. 33) is GRANTED in part,

DENIED in part.  It is further ORDERED that Defendants Borough of Upper Darby, Officers

Joseph Dougherty, James Billie, Leo Hanshaw and Randy DesRosiers's Motion for Summary

Judgment (Doc. No. 35) is GRANTED in part, and DENIED in part.

I.      BACKGROUND

The case before this Court arises from allegations of excessive force, assault, and false

arrest, among other claims, that occurred in connection with a police response to plaintiffs' call

for assistance.  On March 12, 2004, Pauline Hammock placed a 911 call from her home at 3

Chatham Road in Upper Darby Township requesting assistance to escort her husband Ron

Hammock ("Mr. Hammock") into involuntary psychiatric commitment.[1]  At the time the call was

---

[1]According to Pauline Hammock's deposition testimony, Mr. Hammock was suffering
from mental delusions and "wasn't thinking rationally.  He was confusing reality with fiction."
(Pauline Hammock Dep. 15:17-18.)  "[H]e started referring to himself as Jesus . . . . he said that
he felt like he was going to die or that he had to die."  Id. at 16-17.  Plaintiffs stated in their
complaint that this behavior was "a result of his withdrawal from medication."  (Pls.' Compl. ¶
14.)

placed, Mr. Hammock as well as several family members were at his home, including his mother

Elizabeth Hammock, age 71, his sisters Diane Dockett ("Ms. Dockett") and Claudette Brown

("Ms. Brown"), ages 47 and 46, respectively, his wife Pauline and his two sons.[2]  The 911

dispatcher put out a "domestic, not in progress" radio call and several police officers responded.

Officer James Billie ("Officer Billie") of the Upper Darby Police Force and Officer Wayne

Whitlock ("Officer Whitlock") of the Millbourne Police Department[3] were first to arrive at the

Hammock residence, followed closely by Officers Joseph Dougherty ("Officer Dougherty") and

Leo Hanshaw ("Officer Hanshaw") of the Upper Darby Police Force.  (Pls.' Counter Statement

of Undisputed Facts ¶¶ 11-13.)  Officers Billie and Whitlock met Mr. Hammock at the door and

directed him to step outside to where Officers Dougherty and Hanshaw were standing on the

driveway.  (Id. ¶¶ 11-14.)  Mr. Hammock complied and went outside, as did Ms. Dockett,

Elizabeth Hammock and Ms. Brown, while Officers Billie and Whitlock entered the house to

speak with Pauline Hammock.  (Id. ¶¶ 12, 22.)

Up to this point, the facts are largely undisputed.  Testimony about the events that

followed, however, is understandably conflicted.  The parties agree that once Mr. Hammock

went outside, he truthfully informed Officers Dougherty and Hanshaw that he was a former state

trooper.  (Dockett Dep. 109:22-110:10, Nov. 1, 2006.)  He then attempted to persuade the

---

[2]Except for Mr. Hammock himself, everyone in the house expected the police to be called.  (Pauline Hammock Dep. 22:23-26:9.)

[3]While not a member of the Upper Darby Police Force, Whitlock apparently "assists [them] from time to time" and responded to the radio call because 3 Chatham Road lies on the border between the Upper Darby and Millbourne townships.  (Dougherty Dep. 51:18, Nov. 28, 2006; Whitlock Dep. 9:15-10:3, Nov. 30, 2006.)  The record further shows that Officer Whitlock knew at least one of the Upper Darby officers.  "Q: And you know Officer Billie, I assume?  A: Yes, I know him through working with him."  (Whitlock Dep. 11:13-14.)

officers to go to the garage with him to look at some trophies, to which the officers "told him to stop . . . because he might have weapons in there." (Id. 110:4-7)  According to plaintiffs' version of events, Officers Dougherty and Hanshaw then became "agitated" and started shouting and cursing at Mr. Hammock:

> [Ron] was talking about God and how none of his trophies or anything meant anymore to him because he had Jehovah in his life.  And the more he talked, I think the more they were agitated. . . . [T]hey started yelling.  Ron started saying that you don't have to talk to me that way, this is my home . . . . [T]hat's when the officer started yelling, telling him to shut the F up, you're under arrest.  And I said wait a minute, I said maybe they don't know what's going on . . . . And they told me put your hands down, put your hands down.  So I placed my hands down. . . .  I said you all don't know what's going on, he's sick.

(Id. 44:4-47:6.)

According to plaintiffs, they then observed Officer Dougherty "unsnap the holster of his police revolver," at which point all three started to scream.  (Dockett's Answers to Interrogatories ¶ 2.)  By this time, the commotion had drawn Pauline Hammock as well as Officers Billie and Whitlock out to the driveway as well.  Several of the officers proceeded to handcuff Mr. Hammock, push him to the ground, and "at least five officers started beating him and kicking him" in front of his family.  (Dockett Dep. 50:17-51:12, 115:1-4.)  Ms. Brown "started hollering that we don't have any weapons, that we are Jehovah Witnesses, that we don't believe in violence."  (Brown Dep. 42:19-43:20, Nov. 6, 2006.)  As Ms. Brown was screaming she felt "a metal baton" strike her ankles and "a police officer's knee . . . in her back," and she was pushed to the ground and hit her chest.  (Id. 50:10-52:12.)  Later, another unidentified officer came up from behind and "yanked" her and "pulled [her] backwards," causing her to fall to the ground and " dislocate[] [her] shoulders."  (Id. 116:5-20.)

Ms. Dockett also alleged that she was hit with a police baton.  Upon seeing the officers

shout at Mr. Hammock, she raised her hands "in a protective gesture" and "Officer Dougherty . .

. came to the front and hit [her] with the stick."  (Dockett's Answers to Interrogatories ¶ 2;

Dockett Dep. 113:14-15.)   This was observed by Ms. Brown, who herself was still lying face-

down on the ground.  "My sister was backing up and the [sic] Officer Dougherty was swinging a

long, metal piece. . . . She had her hands down blocking it, and he was hitting her hands."

(Brown Dep. 57:6-10.)[4]  Ms. Dockett held up her hand and said, "you broke my fingers," but

Officer Dougherty simply told Officer DesRosiers, who had arrived in the meantime, to arrest her

since she had allegedly hit him.  (Dockett Dep. 56:18-21.)  Officer DesRosiers then forced Ms.

Dockett to the ground.  "[T]he next thing I know I was down on the ground with a knee in my

back and I was being handcuffed . . . . I felt somebody jump on my back."  (Id. 56:22-57:5.)

Elizabeth Hammock, Mr. Hammock's elderly mother, also testified to being pushed to

the ground by an unidentified officer.  She testified:

> It was like a terrible dream to me.  I didn't think no officers would
> mistreat three women, especially older women in that fashion. . . . He pushed
> me with his hands.  He was telling me to shut up. . . . I said I'm old enough to be
> your mother.  He said I don't care how old [you] are, you shut up.  That's when
> he pushed me. . . . I had a lot of scarring on my arms and my legs. . . . [T]he only
> thing I remember was going down.

(Elizabeth Hammock Dep. 29:9-31:13, Nov. 1, 2006.)  Ms. Brown saw her mother get pushed,

and when she attempted to help her she was again attacked from behind by an unidentified

officer who dislocated her shoulders.  (Brown Dep. 115:13-117:12.)  "I kept screaming, why

---

[4]Officer Dougherty admitted to using his baton during the incident and "sw[i]ng[ing] the
baton twice," though he insists that he used it only to subdue Mr. Hammock, not Ms. Dockett.
(Dougherty Dep. 87:16:88:11.)  Officer Whitlock also testified to being hit in the leg by Officer
Dougherty's baton.  (Whitlock Dep. 52:21-54:3.)

4

would you do this to my mother.  And I guess I was irritating them . . . but then right after I was saying that somebody came behind me and . . . when they yanked me, pulled me backwards." (Id. 115:24-116:5.)  Elizabeth Hammock recalled her confusion at the mayhem: "I couldn't understand why it was happening to us because we weren't violent people.  We didn't go out there and threaten nobody, nothing like that.  Everything got out — the police officers were really out of control."  (Elizabeth Hammock Dep. 21:18-23.)

Ultimately, Mr. Hammock was convicted of assault and resisting arrest.  Ms. Dockett was convicted of obstructing the administration of law or other governmental function.  (Pls.' Counter Statement of Undisputed Facts ¶ 88.)[5]  Ms. Brown was also arrested and charged with obstructing the administration of law or other governmental function, as well as disorderly conduct, but all the charges against her were subsequently dismissed.  (Id. ¶ 102.)  All three plaintiffs — Ms. Brown, Ms. Dockett, and Elizabeth Hammock — sustained physical injuries from the March 12th incident.  Ms. Brown was transported from the scene by ambulance and was

---

[5]Defendants assert that because Ms. Dockett was convicted by a jury of obstructing the administration of law or other governmental function, her Fourth Amendment § 1983 claims cannot stand since they would amount to a collateral attack on her conviction under Heck v. Humphrey, 512 U.S. 477 (1994) (holding that a plaintiff may not recover § 1983 damages if doing so would necessarily imply the invalidity of his prior conviction).  We disagree.  Ms. Dockett's conviction merely encompassed a finding that she physically interfered with the officers.  See 18 Pa. Cons. Stat. Ann. § 5101 (2007) (defining the misdemeanor offense as the "intentional[] obstruct[ion of] . . . the administration of law . . . by force, violence, physical interference or obstacle, . . . or any other unlawful act").  We do not see how such a finding would be compromised if she were to prevail on her excessive force claim, since holding otherwise would imply that a police officer could constitutionally pistol-whip any person who physically interfered with his duties, no matter how inconsequentially.  Our conclusion is bolstered by the fact that Ms. Dockett was *acquitted* of both simple assault ("intentionally, knowingly, or recklessly causing bodily injury") as well as resisting arrest (creating a "substantial risk of bodily injury" or "employ[ing] means justifying or requiring substantial force to overcome the resistance" with the intent to prevent a lawful arrest).

5

required to use a sling for her right shoulder.  (Pls.' Resp. Ex. K.)  Ms. Dockett was diagnosed

with a possible fracture to the third and fourth fingers on her left hand and required the use of a

splint.  (Pls.' Resp. Ex. M.)  Elizabeth Hammock suffered severe bruising on her arms and legs.

(See Pls.' Resp. Ex. L.)

On May 1, 2006, plaintiffs commenced this suit against Officers Dougherty, Hanshaw,

Whitlock, Billie, and DesRosiers, as well as the Borough of Upper Darby.  They seek damages

under 42 U.S.C. § 1983 based on defendants' alleged Fourth and Fourteenth Amendment

violations, as well as deprivation of their civil rights under 42 U.S.C. §§ 1985(3) and 1986.[6]

Plaintiffs also assert various state claims: All three allege assault and battery and Ms. Brown

additionally alleges false arrest and malicious prosecution.

II.     LEGAL STANDARD

In considering a motion for summary judgment, the Court must examine "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits," to

determine whether there is any "genuine issue as to any material fact."  Fed. R. Civ. P. 56(c).  A

genuine issue of material fact exists when "a reasonable jury could return a verdict for the

nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In ruling on the

motion, the Court must draw all reasonable inferences in the light most favorable to the

nonmoving party, and "may not weigh the evidence or make credibility determinations."

Boyle v. City of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998); Anderson, 477 U.S. at 255.

---

[6]Plaintiffs originally alleged First, Fifth, and Eighth Amendment violations in their
complaint, but later conceded that no causes of action existed under these Amendments in their
response to Defendants' Motion for Summary Judgment.

Therefore, "where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d. Cir. 1992), cert. denied, 507 U.S. 912 (1993).

III.    DISCUSSION

A. 42 U.S.C. § 1983 Claims Against Individual Officers

Section 1983 provides a civil remedy for the violation of one's constitutional rights by a party acting under color of state law. 42 U.S.C. § 1983 (2007). Plaintiffs allege that the officers' use of excessive force violated their Fourth and Fourteenth Amendment rights. See Pls.' Memo. at 7.[7] However, the Supreme Court has held:

> [A]ll claims that law enforcement officials have used excessive force —
> deadly or not — in the course of an arrest, investigatory stop, or other
> 'seizure' of a free citizen should be analyzed under the Fourth Amendment
> and its 'reasonableness' constitutional standard, rather than under a
> [Fourteenth Amendment] 'substantive due process' approach. Because the
> Fourth Amendment provides an explicit textual source of constitutional
> protection against this sort of physically intrusive governmental conduct, that
> Amendment, not the more generalized notion of 'substantive due process,'
> must be the guide for analyzing these claims.

Graham v. Connor, 490 U.S. 386, 395 (1989) (emphasis in original). The Third Circuit has consistently followed this approach. See, e.g., Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999), Fagan v. City of Vineland, 22 F.3d 1296, 1305 n. 5 (3d Cir.1994) ("[E]xcessive force claims against the police are actionable under the Fourth Amendment rather than the substantive

---

[7]Plaintiffs are notably unclear about the grounds on which their Fourteenth Amendment claims are based. While they insinuate that Ms. Dockett was capriciously arrested for proclaiming her injuries, they assert neither a §1983 false imprisonment claim nor a First/Fourteenth Amendment retaliation claim. Their only specific reference to the Fourteenth Amendment arises in the context of excessive force.

component of the Due Process Clause.").  This Court therefore finds plaintiffs' excessive force claims to be governed by the Fourth, not the Fourteenth, Amendment.[8]

The "reasonableness" standard articulated in the Fourth Amendment requires a highly fact-specific inquiry into the circumstances of each particular case.  "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Bell v. Wolfish, 441 U.S. 520, 559 (1979).  The question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."  Graham, 490 U.S. at 397.  The Supreme Court emphasized:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.

Id. at 396-97 (internal quotation marks and citations omitted).

---

[8]As all three plaintiffs are alleging *intentional* physical contact by the defendants, we find that the excessive force occurred in the course of a "seizure," thus implicating Graham.  See Graham v. Connor, 490 U.S. 386, 395 (1989).  The Supreme Court recently affirmed: "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement '*through means intentionally applied.*'"  Brendlin v. California, 127 S. Ct. 2400, 2405 (2007) (emphasis in original) (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991); Brower v. County of Inyo, 489 U.S. 593, 597 (1989)).  Moreover, the Third Circuit Court of Appeals has held that the "use of excessive force is itself an unlawful 'seizure.'"  Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004); Couden v. Duffy, 446 F.3d 483, 496 (3d Cir. 2006).

As it stands, the record is simply too conflicted to permit any reasonableness determination at this stage in the litigation.  This determination can be made only after examining the demeanor of the witnesses at trial.  A primary factor in evaluating "reasonableness" is "whether the suspect poses an immediate threat to the safety of the officers," and on this point plaintiffs' and defendants' stories vary dramatically.  <u>Graham</u>, 490 U.S. at 396.  Defendants testified that physical restraint of both Ms. Dockett and Ms. Brown was necessary since they were "pulling on [Officer Dougherty] from behind" and "grabbing" him during his confrontation with Mr. Hammock.  (Billie Dep. 24:13-29:12; <u>see also</u> Dougherty Dep. 79:4-86:12.)  Officer Dougherty stated that Ms. Dockett "lunged in his direction" and that "her actions were aggressive towards [him]," and Officer Billie stated that he had to "grab ahold of" Ms. Brown to prevent her from "pulling" at Officer Dougherty as well.  (Billie Dep. 30:9; Dougherty Dep. 92:8-94:1.)[9] Officer Dougherty admitted to swinging his truncheon but denies hitting Ms. Dockett, and maintains that he used it only to subdue Mr. Hammock.  (Dougherty Dep. 86:6-88:11.)  Officer DesRosiers claimed that he "t[ook] [Ms. Dockett] to the ground" only because she "was still attempting to grab Officer Dougherty" after he ordered her to put her hands behind her back.  (DesRosiers Dep. 44:12-22.)  All of the officers further deny having pushed Elizabeth Hammock, and Officer Billie testified that he saw her stumble on her own and "lose her footing."  (Billie Dep. 33:23-34:16.)

---

[9]In Officer Dougherty's deposition, he implied that he felt threatened by Ms. Dockett: "Q: Officer Dougherty, did you hit [Ms. Dockett] with your baton?  A: No.  Q: Was there ever a circumstance that arose between you and Diane Dockett during this entire interchange where you would have felt justified in hitting her with your baton?  A: Yes. . . . When she came at me the second time, when she grabbed me from behind . . . . because her — her actions were aggressive towards me.  Q: You felt they were aggressive towards you rather than protective toward her brother?  A: At that point, yes."  (Dougherty Dep. 92:14-93:7.)

Because defendants' characterization directly conflicts with plaintiffs' claims that they were innocent, non-violent victims of police officers gone out of control, this Court finds a genuine issue of material fact as to the reasonableness of defendants' actions.[10]  Defendants Whitlock and Hanshaw, however, urge us to find no genuine issue specifically with respect to them since plaintiffs do not assert that either officer engaged in physical contact with any of the women.  (See Def. Whitlock's Memo. at 9; Defs. Upper Darby, Dougherty, Billie, Hanshaw and DesRosiers' Memo. at 7.)  Unfortunately, their focus on physical contact in the context of a § 1983 claim is too narrow.  "If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is *directly* liable under Section 1983," provided he had a "realistic and reasonable opportunity" to intervene.  Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002) (emphasis added) (extending the "supervisory liability" doctrine of Baker v. Monroe Twp., 50 F.3d 1186 (3d Cir. 1985), to officers who knowingly acquiesce to other officers' actions, regardless of rank).[11]

> The approving silence emanating from the officer who stands by and
> watches as others unleash an unjustified assault contributes to the actual use of

---

[10]We likewise find a genuine issue as to Ms. Brown's § 1983 claim that she was arrested and charged by Officer Billie without probable cause, since this goes to the key question of whether defendants' actions were justifiable under the circumstances.  See Montgomery v. DeSimone, 194 F.3d 120, 124 (3d Cir. 1998) ("[T]he question of probable cause in a Section 1983 damage suit is one for the jury").

[11]While Smith v. Mensinger, 293 F.3d 641 (3d Cir. 2002), was a prison case involving an alleged Eighth rather than Fourth Amendment violation, we nevertheless find it applicable. Indeed, the Court of Appeals seemed to imply that its holding was *more* applicable outside the prison context where "the obvious security concerns inside the [prison's] close confines" are not at issue.  Id. at 651 (explicitly stating that the status of defendants as police officers versus corrections officers "does not change our analysis").

excessive force, and we cannot ignore the tacit support such silence lends to those who are actually striking the blows.  Such silence is an endorsement of the constitutional violation resulting from the illegal use of force.

Id. at 651.  See also Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

Therefore, even if it is undisputed that Officers Whitlock and Hanshaw did not personally assault the plaintiffs, they are nonetheless subject to the same legal inquiry as their more "physical" co-defendants under Third Circuit law.[12]  Moreover, there exists a genuine issue as to whether the two officers had a "realistic and reasonable opportunity" to intervene on plaintiffs' behalf.  Smith, 293 F.3d at 651.  Though plaintiffs testified that multiple officers "beat[] and kick[ed]" a handcuffed Mr. Hammock gratuitously while plaintiffs were being assaulted, the officers countered that they engaged Mr. Hammock only defensively since he first "struck" and "punched" them.  (Dockett Dep. 115:2-4; Hanshaw Dep. 44:20-22.)  There is also a genuine issue as to which of the officers pushed Elizabeth Hammock, since while she provided visual evidence of her physical injuries she was unable to positively identify her assailant by name.  (Elizabeth Hammock Dep. 33:15-23.)[13]

Our analysis of plaintiffs' § 1983 claims does not end there, however.  Defendants contend that even if their actions were unconstitutional, they are nevertheless entitled to qualified

---

[12]We recognize that this sort of inquiry makes Officers Whitlock and Hanshaw's culpability turn on whether their associates' actions are found to be unconstitutional.  Since the latter finding is one to be made at trial, however, we cannot dismiss the claims against Officers Whitlock and Hanshaw before that determination is made.

[13]Elizabeth Hammock seemingly implied in her interrogatory answers that Officer Dougherty was the one who pushed her.  (See Elizabeth Hammock's Answers to Interrogatories ¶ 2.)  However, she admitted in her deposition that she did not write these answers herself, and stated that "some of the information in here I had no way of knowing at the time."

immunity.  (See Defs. Upper Darby, Dougherty, Billie, Hanshaw and DesRosiers' Memo. at 12.)

It is true that we are charged with ruling on this issue outright, since "[t]he privilege is '*an*

*immunity from suit* rather than a mere defense to liability.'"  Saucier v. Katz, 533 U.S. 194, 200

(2001) (emphasis in original) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  Under

Saucier, courts must use a two-step inquiry to rule upon qualified immunity.  First, we must

determine whether the facts taken in the light most favorable to the plaintiff show that the

officer's conduct violated a constitutional right.  See Saucier, 533 U.S. at 201.  We find that

plaintiffs' submission of facts, when viewed favorably, show that defendants violated their

Fourth Amendment rights.

Second, we must ask whether the constitutional right at issue was "clearly established."

Id.  "That is, in the factual scenario established by the plaintiff, would a reasonable officer have

understood that his actions were prohibited?"  Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir.

2001).  "If the law did not put the officer on notice that his conduct would be clearly unlawful,

summary judgment based on qualified immunity is appropriate."  Saucier at 202 (citing Malley v.

Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or

those who knowingly violate the law")).  Based on the facts alleged by plaintiffs, we conclude

that it would have been clear to reasonable officers that their conduct was prohibited.  Plaintiffs

consist of two women in their forties and another woman who was over seventy at the time of the

incident.  The altercation occurred during the daytime at Mr. Hammock's home in the presence

of his family, with Mr. Hammock's two teenaged sons in the house.  (Dockett Dep. 30:19-32:7.)

Pauline Hammock called the police of her own accord, and the plaintiffs all had the expectation

that the police would assist in transporting Mr. Hammock to the hospital.  (Pauline Hammock

Dep. 22:23-26:9.)

Furthermore, when the police arrived "everybody was pretty well dressed," with Mr. Hammock "wearing brown pants and . . . a white button down shirt." (Billie Dep. 14:10-15:2.) There was no sign of any disturbance, no visible evidence of any drugs or alcohol, and Mr. Hammock himself answered the door and stepped outside as soon as instructed to do so by the officers. (Id. at 12:24-18:4.) Everyone was unarmed and Ms. Brown repeatedly told the officers "we are Jehovah's Witnesses . . . we don't believe in violence." (Brown Dep. 43:2-20.) None of the plaintiffs engaged in any voluntary physical contact with defendants aside from attempting to deflect their blows, and all testified to having attempted to calm the officers down throughout the incident. (See Dockett Dep. 46:17-47:10; Elizabeth Hammock Dep. 21:12-15; Brown Dep. 43:14-17.)[14] In spite of all this, according to plaintiffs, defendants shoved them, knocked them down, and beat Ms. Dockett with a metal baton, causing severe bruising and contusions as well as possible fractures requiring long-term immobilization of the extremities. (See Dockett Dep. 113:14-15; Elizabeth Hammock Dep. 30:4-31:13; Brown Dep. 50:10-52:12; Pls.' Resp. Ex. K, L, and M.)

Interpreting the facts in plaintiffs' favor, this Court finds that reasonable officers in this particular situation would have known that such use of physical force was prohibited. The record before us presents facts far more analogous to those excessive force cases where qualified

---

[14]"I was more so like trying to calm everybody down because I didn't know why everybody was yelling. . . . And I said wait a minute, I said maybe they don't know what's going on, you know." (Dockett Dep. 46:17-47:6.) "I said, you don't have to worry, we don't have any weapons, you don't have to worry about anything. Because I thought maybe [Officer Dougherty] was afraid for some reason. And I just kept telling him we are Jehovah Witnesses, we are peaceful, you don't have to worry about anything." (Brown Dep. 43:14-20.)

immunity was denied by the Third Circuit rather than where it was granted.  See, e.g., Couden v. Duffy, 446 F.3d 483, 497 (3d Cir. 2006) (finding no qualified immunity where officers on a stakeout mistook 14-year-old plaintiff for a suspect and pointed guns at him and handcuffed him despite his cooperation); Kopec v. Tate, 361 F.3d 772, 776-777 (3d Cir. 2004) (finding no qualified immunity where officer ignored plaintiff's requests to loosen his handcuffs due to extreme pain when he was arrested for disorderly conduct).  Defendants had no reason to view plaintiffs as a threat, as the circumstances here varied vastly from those "hot pursuit" or "drug bust" cases where officer safety concerns justify the use of force and warrant qualified immunity. See Carswell v. Borough of Homestead, 381 F.3d 235, 242-44 (3d Cir. 2004) (affirming grant of immunity to officer who fired at a wanted suspect that had just escaped from an armed policeman, and who "was running at full speed directly toward [the officer's] police cruiser").

To the extent that Officers Whitlock and Hanshaw did not have direct contact with plaintiffs, we likewise find that reasonable officers in their positions would have found the others' conduct sufficiently improper such that they would know they were legally required to intervene.  See Baker, 50 F.3d at 1193 (finding no qualified immunity where officer on a drug raid acquiesced to other officers' acts of pointing guns at a mother and her children "without any reason to feel threatened" by them).  Both officers were outside on Mr. Hammock's driveway during the altercation; in fact Officer Whitlock testified that he was so close that he was struck in the leg by Officer Dougherty's baton.  (See Whitlock Dep. 52:10-54:3.)  In addition, a reasonable officer would have understood that arresting and charging Ms. Brown — four days after she was transported to the hospital from the scene via ambulance — was unlawful given the lack of probable cause.  As such, qualified immunity is denied to all individual defendants with respect

to all of plaintiffs' § 1983 claims.

B. 42 U.S.C. § 1983 Claims against Borough of Upper Darby

In <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658 (1978), the Supreme Court held that a municipality may be held liable under § 1983 "only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989) (emphasis in original). Plaintiffs submit both a failure-to-train theory as well as a failure-to-investigate theory in support of their <u>Monell</u> claims. (<u>See</u> Pls.' Memo. at 14.) Specifically, plaintiffs contend that the Borough of Upper Darby "encouraged" and "tolerated" its police officers' use of excessive force, and that it was "deliberately indifferent to . . . the need for more or different training, supervision, investigation, or discipline" with regards to police misconduct. (Pls.' Compl. ¶ 32.)

The standard for finding police training inadequate for purposes of § 1983 is "deliberate indifference to the rights of persons with whom the police come into contact." <u>City of Canton</u>, 489 U.S. at 386. In other words, plaintiffs must demonstrate that the municipality maintained a policy with "deliberate indifference" to the constitutional deprivations that the policy has caused. <u>See</u> <u>id.</u> at 389. Admittedly, therefore, "[t]he scope of failure to train liability is a narrow one." <u>Brown v. Muhlenberg Twp.</u>, 269 F.3d 205, 215 (3d Cir. 2001). Here, defendants argue that deliberate indifference is generally established "only where the failure [to train] has caused a pattern of violations," which plaintiffs have not demonstrated. <u>Berg v. County of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000). (<u>See also</u> Defs. Upper Darby, Dougherty, Billie, Hanshaw and

15

DesRosiers' Memo. at 16.)  We agree.  The record contains no evidence that Upper Darby officers engaged in any pattern of constitutional violations.

Indeed, the only evidence relevant to plaintiffs' failure-to-train claim shows that Upper Darby *did* provide "use of force" training to its police officers.  (See Pls.' Resp. Ex. Q.)  All the officers duly attended police academy training and all were subject to Upper Darby's Department Policy on Use of Force, which provides detailed guidance on "police presence, verbal commands, hands on non-lethal weapons, impact weapons, and deadly force."  (DesRosiers Dep. 14:13-15, Nov. 30, 2006.)  Additionally, there is testimony that everyone at Upper Darby was given a yearly "refresher course" on the use of a police baton.  (Id. 18:7-11.)  Plaintiffs attempt to rebut this evidence by claiming that Officers Hanshaw, Billie, and DesRosiers[15] did not receive as much training as Officer Dougherty, but we cannot be persuaded to impose liability simply based on what a municipality *could have* done.  See City of Canton at 428-29 (refusing to assign municipal liability based on what a city "could have done" since doing so would result in *"de facto respondeat superior"* and "engage the federal courts in an endless exercise of second-guessing municipal employee-training programs").[16]  We therefore cannot find the evidence sufficient to support plaintiffs' failure-to-train claims against Upper Darby.

---

[15]As an officer from the Millbourne Township, who is not a defendant in this case, Officer Whitlock's training is irrelevant to our inquiry.

[16]The Supreme Court explained its rationale: "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident.  Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities  — a result we rejected in Monell."  City of Canton v. Harris, 489 U.S. 378, 392 (1989) (internal citations omitted).

Similarly, plaintiffs' failure-to-investigate claims must fail.  The Third Circuit Court of Appeals has recognized City of Canton's "deliberate indifference" standard to be equally applicable in failure-to-investigate cases.  See Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995) ("The deliberate indifference standard applies to plaintiffs' allegations of . . . failure to investigate"); San Filippo v. Bongiovanni, 30 F.3d 424, 445-46 (3d Cir. 1994).  The question is whether Upper Darby's internal investigatory and disciplinary procedures constituted a "municipal policy" of deliberate indifference toward the risks of police misconduct, and whether adherence to that policy proximately caused plaintiffs' constitutional injuries.  Groman, 47 F.3d at 637.  See also Lyons v. City of Philadelphia, 2007 U.S. Dist. LEXIS 76646, *23 (E.D. Pa. Oct. 15, 2007).

This Court finds no such policy here.  The Supreme Court has ruled that "a single incident of unconstitutional activity is not sufficient to impose liability under Monell." Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).  See also Groman, 47 F.3d at 637 ("[T]his case *standing alone* does not provide sufficient proof of a policy or custom to satisfy the dictates of § 1983") (emphasis added).  Instead, the law requires that there be multiple prior instances of failing to investigate, sufficient to put a municipality on notice such that it could be deemed to have developed a policy or custom.  See id.  Here, plaintiffs make no showing that Upper Darby knowingly maintained a policy of allowing unconstitutional behavior to go unchecked.  Plaintiffs' expert, while opining that "there was no real investigation of this incident," confined the scope of his review to only this particular incident and offered no evidence whatsoever as to Upper Darby's handling of other incidents.  (Pls.'s Resp. Ex. R.)  In fact, there is no indication that plaintiffs' expert even attempted to determine Upper Darby's past

disciplinary practices.  Since a reasonable jury could not find based on this record that Upper

Darby's failure to investigate rose to the level of deliberate indifference, summary judgment must

be granted on this claim.

C. 42 U.S.C. §§ 1985, 1986 Claims

Plaintiffs also allege a deprivation of their constitutional rights under 42 U.S.C. §§

1985(3) and 1986.  Section 1985(3) creates a civil remedy where two or more persons conspire

"for the purpose of depriving, either directly or indirectly, any person or class of persons of the

equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. §

1985(3) (2007).  Section 1986 creates a civil remedy where a person "neglects or refuses" to

prevent the commission of the wrongs covered by Section 1985.  42 U.S.C. § 1986 (2007).

Because a § 1985 violation is a prerequisite to a § 1986 violation, one cannot establish the latter

without first establishing the former.  See Clark v. Clabaugh, 20 F.3d 1290, 1295 (3d Cir. 1994).

A requisite element of a § 1985(3) claim is "some racial, or perhaps class-based,

invidiously discriminatory animus behind the conspirators' action."  Griffin v. Breckenridge, 403

U.S. 88, 102 (1971).  See also Davis v. Twp. of Hillside, 190 F.3d 167, 171 (3d Cir. 1999).

Plaintiffs have submitted only one argument in this respect: the fact that they are African-

American while defendants are Caucasian.  (See Pls.' Compl. ¶¶ 34, 35.)  This, however, does

not suffice to make a showing of racial animus as a matter of law.  See Lowe v. Letsinger, 772

F.2d 308, 311 (7th Cir. 1985) (finding no racial animus where plaintiff's only § 1985 allegation

was that he was African-American); Walker v. Montella, 1994 U.S. Dist. LEXIS 1465, *13 (E.D.

Pa. Feb. 10, 1994).  Moreover, none of the plaintiffs allege that defendants used any racial

epithets, and Ms. Dockett affirmatively denied in her deposition that defendants made any verbal

remarks that would indicate their actions were racially motivated.  (See Dockett Dep. 71:18-

72:21.)[17]  Since no genuine issue exists, Plaintiffs' § 1985 claims, as well as their dependent §

1986 claims, must therefore be dismissed.

D. State Law Claims

        Next, we turn to plaintiffs' state law claims for assault and battery and Ms. Brown's

individual claim for false arrest and malicious prosecution.  Under Pennsylvania law, "[a]ssault

is an intentional attempt by force to do an injury to the person of another, and a battery is

committed whenever the violence menaced in an assault is actually done."  Renk v. Pittsburgh,

537 Pa. 68, 76 (Pa. 1994) (quoting Cohen v. Lit. Brothers, 166 Pa. Super. 206, 209 (Pa. Super.

Ct. 1950).  In the law enforcement context, it is the reasonableness of the officers' force which

determines whether an assault or battery has occurred.  See id.  Separately, courts interpret the

torts of false arrest and malicious prosecution to encompass a lack of probable cause.  See

McGriff v. Vidovich, 699 A.2d 797, 799 n. 4 (Pa. Commw. Ct. 1997) (defining false arrest as

"an arrest made without probable cause"); Donahue v. Gavin, 280 F.3d 371, 379 (3d Cir. 2002)

(listing lack of probable cause as a necessary element of malicious prosecution).  As discussed

previously, this Court finds a genuine issue of material fact as to the reasonableness of the

officers' actions as well as to the existence of probable cause.

        However, defendants maintain that they are immune from liability under the Pennsylvania

---

        [17]Ms. Brown testified that while she was in the hospital, a police officer asked about Ms.
Dockett's nationality.  (See Brown Dep. 108:19-109:21.)  However, Ms. Brown also stated that
the officer was not at the Hammock residence on March 12, 2004, and is therefore clearly not a
defendant in this case. (See id.)

Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. § 8541 (2007) *et seq.* ("PSTCA"). The PSTCA generally grants local agency employees immunity against civil tort claims, but creates a clear exception when "it is judicially determined that the act of the employee. . . constituted . . . willful misconduct." 42 Pa. Cons. Stat. § 8550. "Willful misconduct," in turn, requires evidence that "the defendants actually knew that their conduct was illegal." Sameric Corp. v. City of Philadelphia, 142 F.3d 582, 600-01 (3d Cir. 1998).

In our above analysis denying defendants qualified immunity, we established that *reasonable* officers would have understood their conduct to be unlawful. The inquiry for purposes of PSTCA immunity, however, is whether *these particular officers* knew their conduct to be unlawful. That is a question we did not reach, and decline to reach here. Since PSTCA immunity differs from federal qualified immunity in that it is merely "a defense to. . . liability rather than. . . a right to be free from suits," this factual determination is one for a jury. Africa v. City of Philadelphia (In re City of Philadelphia Litig.), 49 F.3d 945, 958 (3d Cir. 1995). See also Bollinger v. Obrecht, 552 A.2d 359, 363 (Pa. Commw. Ct. 1989).[18] Defendants' motion for summary judgment on plaintiffs' state law claims is therefore denied.

An appropriate order follows.

---

[18]In Bollinger v. Obrecht, the court held that a denial of summary judgment sought on statutory immunity grounds could not be immediately appealed. 552 A.2d 359 (Pa. Commw. Ct. 1989). "A trial court analyzing a[] [PSTCA] immunity claim is actually deciding the same issues that will arise in the underlying action. Unlike matters of federal immunity, the trial court's interlocutory order denying an immunity claim under Pennsylvania law, is not separate from and collateral to the main cause of action." Id. at 363. The Third Circuit Court of Appeals therefore interpreted Bollinger to say that statutory immunity offers only immunity from liability and nothing more. Africa v. City of Philadelphia (In re City of Philadelphia Litig.), 49 F.3d 945, 958 (3d Cir. 1995).

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ELIZABETH HAMMOCK, et al.,          :

    Plaintiffs,          :          CIVIL ACTION

              :

    v.          :

              :

BOROUGH OF UPPER DARBY, et al.,          :          NO. 06-CV-1006

    Defendants.          :


ORDER


And now, this 31st day of October 2007, it is hereby ORDERED as follows:

1.  Defendant Officer Wayne Whitlock's Motion for Summary Judgment (Doc. No. 33) is GRANTED as to plaintiffs' 42 U.S.C. §§ 1985, 1986 claims only, and DENIED with respect to all other claims.

2.  Defendants Borough of Upper Darby, Officers Joseph Dougherty, James Billie, Leo Hanshaw and Randy DesRosiers's Motion for Summary Judgment (Doc. No. 35) is GRANTED as to plaintiffs' Monell claims and 42 U.S.C. §§ 1985, 1986 claims, and DENIED with respect to all other claims.

3.  A final pretrial conference will be conducted Thursday, November 8, 2007 at 3:00 p.m. in 6614 United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106.

BY THE COURT:

/S/LEGROME D. DAVIS

Legrome D. Davis, J.


21